Thank you very much. Next case is number 2010-5031, Direct TV Group, Incorporated, against the United States. Mr. Byrd. Good morning, Your Honor, and may it please the Court, I'm Coleman Byrd, appearing on behalf of the United States. This Court should reverse the summary judgment entered below and remand for further proceedings because the trial court made two fundamental errors of law. First, in interpreting the credits provision in the Federal Acquisition Regulation to allow payment by hypothetical third-party cost reductions, and second, in holding that the segment closing adjustment that Cost Accounting Standard 413 requires must be made upon all of the closed segment's assets and liabilities without regard to whether the seller keeps 100 percent of the surplus, transfers 100 percent of the surplus, or transfers part but not all of the surplus. In this case, the stipulated and undisputed facts show that Direct TV retained almost $60 million of pension surplus. Well, they seem to dispute that. I don't think that's undisputed. I think, didn't they argue it was just a couple million? And they don't dispute the fact that they retained something, but I thought the amount was in fact disputed. Am I wrong? Well, Your Honor, there's no dispute. If you look at the tables in our brief on pages 18 and 19, there's no dispute that Direct TV retained surplus allocable to the segment of approximately $60 million. What Direct TV is subtracting from that $60 million to arrive at the lower amount is surplus that wasn't allocable to the segment, but was transferred to the buyers anyway. And our contention is that it's quite clear under the language of the cost accounting standard CAS 13 that it's only the assets and liabilities of the segment that are allocable to the segment that can properly figure in the segment closing calculation. And so our position is that on that $60 million, the undisputed percentage shares of the government adds up to about $4.5 million plus interest. The government is entitled to this amount and is entitled to be paid this amount by a cash refund or by an actual cost reduction, meaning a subtraction from the, or a deduction from the cost that the contractor otherwise could legitimately charge the government. Are you able to? Please go ahead. Mr. Byrd, I have a question as to which of CAS form applies. Is it the old form or the amended form 413? It's the amended, I'm sorry, it's the original version in 1977, and that's because all of the surplus that accrued in these pension plans arose under, or due to contributions that were allocated to contracts that were subject to the old CAS or the original CAS and not the amended CAS. Even though the segment closing actually occurred after 1995, we do not dispute that the applicable regulation is the original CAS 413. Even if the agreements provided for any amendments made to 413 be applicable? Are you saying that... In the transaction agreements? Yes. If that were the case, I am not aware that they did so provide, but if the parties had agreed, the difficulty is the transaction agreements in this case were not between the private parties. They were private contractual arrangements. Boeing and Raytheon. Exactly, Your Honor. Now, if former or old 413 CAS applies, and you're saying that even though the segments did not arise until after 1995? The segments arose before 1995, Your Honor. They were not closed until after. What is the applicable date then? Is it the time of the closing or is it before? The applicable date. When the surpluses arose. The court will recall that in the Allegheny and Teledyne case, the court held, this court on the point that the judge, the point that applying the provisions of the 1995 amended CAS to adjust costs that were incurred and paid under contracts that were subject to contractor would be entitled to an equitable adjustment. We're simply applying that. That was addressed to the situation between no CAS 413 at all and the original CAS, and we're simply applying that logic to a situation between the application of the original CAS to and the amended CAS in 1995. Would it make any difference as to whether the old CAS or the new CAS were applicable? Yes, it would. There's not a difference in outcome, but it's certainly easier to reach the result. Under the 1995 amendments, it's quite clear that the segment closing adjustment is made only upon the pension surplus that the contractor retains. Our argument is that that was a mere clarification of the prior rule and the prior understanding and that, in fact, it is the clear intent of the CAS board, as we set out in our brief, to both the original CAS board to require a segment closing adjustment only when you needed to, and the only time you needed to was when the link between the contracts, the surplus of the segment, is broken by a segment closing. Well, if the contracts and the surplus or part of the surplus is transferred to the buyer, then the link is not broken as to that portion of the surplus, and there's no need for the segment closing adjustment. But to reach the conclusion you'd have us reach, as I understand it, I have to construe CAS 413, subsection 12, I have to construe the word segment as limited to amount retained by Direct TV, right? I mean that, because it just says segment throughout. It doesn't say retained amount of the segment. It says segment. So the only way I can get there, it seems, is if I'm willing to construe the word segment as limited to the retained amount. Is that right? Your Honor, this court has already held in the Allegheny Teledyne case that the segment closing adjustment is not made upon the entire surplus of the segment. What does the word segment in CAS 413 mean? The word segment means the business segment. It's a defined term in the CAS. What does it mean? Does it mean the entire amount transferred, or does it mean the portion retained? The word segment. How would the government have me construe that in 413-12? Well, we would have the court construe the word segment as applying to the business segment. And the business segment has pension assets and liabilities in pension plans that are allocated to it. And what we would say is there's... Okay, hold on. I'm not sure I understand your answer. Does the government argue that the word segment means the entire amount, or does the word segment, as used in 413, mean the amount retained? We would say, Your Honor, that it means the amount retained because... So every place the word segment appears, I should construe it as limited in definition to amount retained. The logic of what the CAS Board said in the 1977 preamble would say yes, and we would say yes. You only require the segment closing adjustment when the link between the contracts and the surplus is broken. It's not broken when partial surplus is transferred. Any more than you don't require a segment closing adjustment as to surplus that's allocable to contracts that were entered into before the original CAS 413 was promulgated. In that case... If the segment in 413 in general is limited to amount retained as opposed to the entire pension fund amount, the surplus, then haven't you just excluded from all of 413 the amount they transferred, and haven't you now conceded that you have no right to the surplus in the amount that has been transferred because the statute or the regulation by your proposed construction would not cover it? Since the word segment would be limited to amount retained. The term segment, as I mentioned, is defined in the CAS. And what we're talking about is how do you do the segment closing adjustment? And what we are saying is the way you do the segment closing adjustment is yes, initially you start off with the entire assets and the entire liabilities of the segment, but then you subtract the assets and the liabilities that were transferred in the same way that you transfer and that you subtract the assets that are allocable to contributions entered into before the 1977 CAS took effect. As I understand what you just said, though... Contracts. Counsel, as I understand what you just said, you said you take the entire segment. And each time you're using the word segment, as I understand it, you're referring to the entire amount. That's the starting point, Your Honor. Well, so the government's definition of the word segment then is the entire amount. It's not simply the amount retained, which makes a lot more sense with the rest of this regulation. It would be kind of hard to imagine this regulation as intending that the word segment meant amount retained throughout when it's used. Your Honor, perhaps I misunderstood the court's question. The point I wanted to make was that under the settled precedent of this court, the trial court's entire segment approach comes too late in the day. There are deductions from the assets and the liabilities of the entire segment, and those deductions have been specifically approved by this court. So there's no reason for this court or the court below to have found that the entire segment approach precludes recognizing that when surplus is transferred, there's no reason to have a segment closing adjustment. And if I could very briefly address the credits provision portion, the credits provision portion amounts to the argument that the contractors have made amounts to arguing that because the government was not charged costs by the buyers, that constitutes a cost reduction. But an actual cost reduction, which is what the regulation had in mind, is a reduction in the amount of cost that the contractor was legally entitled to charge. It's not a hypothetical cost reduction. In the same way, perhaps a somewhat simpler example, if the contractor gets a discount and doesn't pay the list price for an item of supplies or services that it needs to perform a cost reimbursement contract, the contractor, it could not be clearer, the contractor can only charge the government the price that the contractor actually paid, the actual incurred cost. And the contractor can't point to the cost reduction and say, we might have paid the cost reduction, and we're entitled to treat that as an offset to a payment obligation that we have under this contract. And that makes no sense whatsoever. But what the trial court found, in effect, is that the buyers not charging pension costs, that the buyers had no right to charge the government, constitutes a cost reduction, but it didn't save the government. That's not an actual cost reduction. That's a hypothetical cost reduction. And it's not cognizable under the credits provision. And we set out in our brief at length that the court's construction below was absolutely unprecedented, never heard of before, contrary to the understanding of the government contract community that a cost reduction means a deduction, a subtraction, and it's a write-off of part of a bill that's otherwise due when owing. And that's not, that cannot be a cost reduction. It is the equivalent to a cash refund. The credits provision requires two things, requires either a cash refund or a cost reduction. And a hypothetical cost reduction cannot constitute a cost reduction that would be cognizable under the credits provision. You're well into your rebuttal time if you wish to say what's left. Thank you, I do. All right, Mr. Byrd. Mr. Wiles. May it please the court, Alexander Wiles for Appellee Direct TV. I want to be as simple as I can. The reason why Judge Firestone should . . . Why did Direct TV keep the $60 million or whatever amount it is? I mean, isn't that improper? Weren't you supposed to transfer the whole thing? No, we could have transferred nothing or kept . . . It was up to us to decide how much we could . . . But you didn't retain any of the liabilities under the pension, so how can you keep some of the assets? Well, there were liabilities associated with the portions of the business that weren't sold. So, yes, there were pension . . . There was still a pension plan at Direct TV following each transaction. Well, this pension . . . The pension that you didn't transfer, though, isn't the pension for the stuff you retained. It's the pension for the stuff you transferred. Well, so the . . . This seems woefully improper, and now you're going to benefit from it. Well, so no, we're not going to benefit. We had, under the rules, Direct TV could have transferred the entire . . . and paid the government $210 million under one transaction and $63 million on the other transaction. But it was trying to transfer the entire surplus, but this is not an easy calculation that one can do immediately. So what happened here is actually quite innocent. What happened is . . . Well, if you were trying to transfer the entire surplus but accidentally, innocently didn't, why don't you do it now? I don't think we can go back. I think there's ERISA issues with going and transferring surplus, but that's not, I don't think, a solvable problem in that way. But here, what we have shown is that the government has received a benefit that far exceeds the amount that we would have had to pay had we paid cash and transferred no surplus. So the government is benefiting from $3.25 billion of assets in the hands of Raytheon and Boeing collectively. And the evidence is undisputed, undisputed, that they have received a benefit that is greater than $273 million, which is their share. But the question is, are they entitled to the benefit on the other stuff? I mean, the government is sort of like an investor here, right? They gave you the money, you invested it, and now you want to tell them that, Oh, yeah, we agreed that we would share the proceeds of the investment if it was successful, but we're actually not going to share all of them. So, no, I don't think that's the way to look at it. The government's share under Teledyne is 8%. So the government has an entitlement, yes, to $273 million. It doesn't have an entitlement to every single penny in the direct TV plans on the dates of the closing. We can satisfy that in a number of different ways, and we satisfied it by transferring, vastly over-transferring, the amount of surplus necessary to make sure that they got $273 million. And the evidence, again, undisputed in this record, is that if you look at the transfer as it occurred on that day, and you look back at it and you say, Was it predictable that the government would receive its share? Its share is not the whole thing. It's not an investment of the whole thing. Its share is 8% under this court's rule in Teledyne, and that's stipulated. So was it predictable that the government would get that share? And the answer is unequivocally yes. We put in the record it was a very simple calculation. But if you had never sold and never transferred, wouldn't the government be in a better position than it is now? Because they would have had some portion, some entitlement to a portion of what you retained. I think that's impossible to say, whether they would be in a better position than they are now. They would have had, because you have a different contractor operating the plan, I mean, the contracts. So I don't think I can just agree with that. But there is $6 million of surplus that wasn't transferred. It turns out, in hindsight, when we did read it, we got 6. To say that you don't divide the plans, you do it on a segment. How was the allocation made at the time of the segmentation, regarding the transfer of liabilities? Sure. So what Direct TV did is you look at the – you're transferring certain – you're transferring certain businesses. Those businesses have employees, they have retirees. You figure out – it's complicated, but you figure out what percentage of the – That's why you are actuarial firms, right? Yes, right. So you have an actuary, and we had an actuary at the time. And the actuary figures out what percentage of the estimated liabilities is being transferred to the buyer. That was about 75%. And then you've got to value the assets, and you have to find 75% of the assets and transfer 75% of the assets. That's what was done. And then the same thing happened the next time, and it just so happens, by coincidence, it was also about 75%. So at the end of the day, it was, you know, one quarter and then one quarter of one quarter. So Direct TV wound up with one-sixteenth, or roughly, of what had been in the plan before these two transactions. Did Direct TV keep any of the liabilities of any of the retirees, or did they transfer them all over to Poland? No, they kept none. Some of these other cases, you have that issue, so then you have to sort of try to parse whether sort of somehow the government is being unfairly treated by the contractor keeping some liabilities. But we don't have that issue. As I said, Direct TV's goal was to avoid, but has now turned into tenure. So you transferred the entire business then to Boeing and to Raytheon. Right. So we had a defense segment, and we transferred it to Raytheon. That left us with a satellite segment, and that went to Boeing, and the segment that we transferred to Raytheon, lock, stock, and barrel, the liabilities and the assets of that segment went. Lock, stock, and barrel, it went to Boeing. It turns out in hindsight when our actuary was forced to recalculate it by virtue of this ongoing litigation that there was an infinitesimal difference. I mean $3 million on three and it's actually more like $6 billion of assets transferred was the difference in the calculation in each transaction. So it's actually six on $6 billion. So the entire defined benefit plan then was transferred and split up between Boeing and Raytheon. It was split up. So what happens is that you have a defined benefit plan. You then take the portion attributable to the defense segment. It goes to Raytheon. Raytheon then creates its own plan solely arising out of this, and that's why the costs reductions are so obvious and inevitable. And then what's left over is at DirecTV. Then three years later there's a second transaction, and the same thing happens. So DirecTV only had the residual amount that was left of the assets. That's the $6 million. Right, it would be. Well, so there were some businesses that were not government contracting businesses whose employees and retirees were part of the plan, so we had that. And then if you look at it in hindsight, we would say that we kept $6 million of the surplus that was within 100% of the surplus if we were trying to achieve some safe harbor transfer. There is a safe harbor in the new CAS. There was no safe harbor in the old CAS. If you fell under the new CAS, if this transaction did, you agree that you would owe the government money based on the amount retained? I think new CAS is pretty clear, yes. Why is it the government correct them? It says that the new CAS essentially is a clarification of what the old CAS, 413. So because it added 128 words, that really changed the tenor of what old CAS said, and this court in Teledyne in confronting a virtually identical issue said, and I'm quoting from 316 F. 1380, quote, it is illogical to say all the additional text of the amendment simply clarified rights that already existed. And then it even goes on to say regardless, even if the amendments only clarify rights under the original CAS, it does not follow that the amendments merely interpret that provision. So this court in Teledyne has said it was a new CAS board. It wasn't the old CAS board. It was a new CAS board that came into play. When they make a significant change in the language, this court and the court of claims should interpret it as altering the intent of the board. And so the rules changed when new CAS came into play. Note when Direct TV did its transactions, no one knew exactly what the rules were, and there was no effort to retain anything. In fact, the government conceded, not in the court below, but in its briefs here, the government conceded that if Direct TV transferred what it thought was 100% of the surplus at the time, the government would have no claim. Well, there's no dispute, actually, over that issue. We did transfer what we thought was 100% of the claim, and it's only because the government asserted a claim against us, that a recalculation based on information that had come to light, you know, liabilities just as actuarial estimates and stuff, so those things change, and information that had come to light as of the time that our expert did this work in this case, showed a $3 million difference in each transaction. And so it's only because of that that this calculation even occurs, and I would add that the government's claim that was asserted by the contracting officer that we originally started to litigate was on a totally different theory. It was on a theory that not that we transferred less because of something, it was that we did it entirely wrong, that we should have accounted for separate segments, and the government recognized that they couldn't prevail on that. So we're sort of hauled into court on a theory. The theory turns out to be completely false. The government abandons the theory, but between the time that we're hauled into court and the time that the government abandons the theory, our actuaries do what they're supposed to do, which is a recalculation for purposes of the court, for the purpose of evidencing the court, and that shows a $3 million in each, so $6 million total surplus that we've got. And that's the only surplus that's around. And I just want to emphasize that the point here is that, as Judge Firestone said, the government is asking for Directive E to pay them twice. We have provided sufficient surplus that their teledined share, which is the only thing they're entitled to, it's the only thing that they have any interest in, is satisfied many times over. I mean, the evidence not disputed in the record is that, as of 2007, it was $1.28 billion that they had benefited, as compared to their share, which is $273 million. So they have a protectable interest of $273 million. They've gotten $1.28 billion already, and here they're asking, they're trying to ask for a double payment for a sliver of that. Well, it's not double payment, but they're entitled to receive the additional $6 million. Well, they have no entitlement to force us to transfer surplus. Their entitlement is to the share, their teledined share of the surplus, which is 8%. So 8% of roughly $3 billion is their share. And that is what their entitlement is. We could have kept $3 billion of surplus and written them two checks for totaling $273 million. We didn't do that. What would have happened, theoretically, if, in fact, those plans were frozen instead of transferred up, and you just closed the businesses down at that point in time? So if the plans are— You would have been able to take all of the surplus out. Correct, and we would have owed the government, I think, $273 million, unless there's something about a termination that I don't understand. Why didn't you keep more, then? If you think that you're entitled to have kept everything short of the $273 million, why didn't you keep it? So there's no evidence in the record on this, but the answer is DirecTV was trying to avoid sitting in court for 10 years. And they said, okay, we don't know what the rules are. You paid $1.8 billion to avoid being in court? Boy, that's a heck of a settlement, isn't it? Yeah, I mean, they— So you have to put yourself back into the mindset of 1997. You're in a world where the economy and the stock market has done really well. You don't know what the rules are. You've got a surplus in your pension plan. If you don't transfer it, you have an obligation that comes out of your general funds, and you don't know what that obligation is. You have no idea what it is because the law isn't clear. Teledyne hasn't been decided. Gates v. Raytheon hasn't been decided. None of the cases that inform the rulings of what ought to be done have been decided. So DirecTV made a conservative decision. And they said, look, let's just transfer all the surplus, and if we transfer all the surplus, we can hardly be criticized. We're here, but that's what we're trying to do. Well, if you had kept the plans, I think a lot of fine benefit plans now are under water because of the change in actuarial basis. That's true. But here we don't have that problem because we've demonstrated that the government already got the benefit. And one interesting thing, I'll close with this, is that if you look at the record, 101 and 102 and 458, 459, 461, and 462, what it reveals is that not only did the government get the benefit, but it had the benefit. It had the full benefit, that $273 million, by the time it asserted a claim. That's how gross the over-transfer was. Thank you very much. Any more questions? I do have a question. Just for my own curiosity, if, in fact, the fine benefit plan had a billion dollars in deficit, would the government need to participate in making up that deficit? Yes, this is a two-way provision, and you haven't given me enough facts to explain how it would happen. But, yes, it's a two-way provision. It is a two-way provision. That's right. That's what I thought, but just to make sure. Thank you. Thank you. Mr. Wiles? Mr. Byrd? Extremely briefly, Your Honor. With respect to whether it was $60 million or $6 million, I would invite the Court's attention to the stipulation of the parties at page A, 305B, and C, which makes clear that assets were transferred that didn't belong to the segment, and they cannot properly figure in the segment-closing calculation. The question was raised, why did not DirecTV keep more of the surplus? In the real world, companies do not transfer $3.2 billion of surplus and get nothing in return. There's nothing in the record on this, but to transfer that amount and get nothing in return would raise questions of the waste of corporate assets. But it's not in the record. I think that's not before us. Contrary to what my friend, Mr. Wiles, said, the test is not was it predictable that the government would be paid at the time of the transaction. The test is whether the government was paid. Was it paid by a cash refund or was it paid by a cost reduction? And very simply, hypothetical cost reductions don't count. The FAR drafters, and remember we're interpreting the credits provision here, the FAR drafters could never have intended to impose upon the government the burden of waiting 10 years to see an actuarial study that occupies close to 700 pages in this appendix in order to determine whether it had been paid or not. The way the credits provision works is you pay by a check or you pay by knocking the amount off of an invoice so the government can look at the invoice and say, oh, I see, we've been paid. You're not supposed to wait 10 years and bring in the actuaries to review complicated hypothetical contrary to fact speculations. The one final point, sorry, Your Honor, if I may, one final point. All right, one final point, if you'll be brief. We did not concede contrary to – Is this a new point or – It's a response to – the statement was made. I wanted to correct the record. We did not concede that if DIRECTV had transferred what it thought was 100% of the surplus, that there would be no liability. What we said was that they had to transfer 100%. That's an objective standard. It's not a subjective standard. And we did argue also below in our briefs that the absurd result, if you transfer 100%, the seller has no liability. If you transfer 99.5% under the trial court's reading, the seller has to make a segment closing adjustment upon the entire amount of the surplus. And we submit that makes no sense. It's contrary to the cast board's intent. Thank you, Your Honor. Thank you, Mr. Baird and Mr. Wiles. The case is taken into submission.